UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – x

EMMANUEL ELLUL, VALERIE CARMACK and : 
HAZEL GOULDING, on behalf of themselves and all :   Index No. 09 Civ. 10590 (PAC)
others similarly situated, :   ECF Case
  :
                Plaintiffs, :
  :   CLASS ACTION COMPLAINT;
  - against - :   JURY TRIAL DEMANDED
  :
THE CONGREGATION OF CHRISTIAN BROTHERS, :
THE ORDER OF THE SISTERS OF MERCY, MERCY :
INTERNATIONAL ASSOCIATION and CATHOLIC :
RELIGIOUS ORDER DOES 1-10, :
  :
              Defendants. :

– – – – – – – – – – – – – – – – – – – – – – – – – – – – – – X

## I.   <u>NATURE OF THE CASE</u>

1.     This case concerns a dark and, until recently, hidden chapter of history in which thousands of boys and girls, some as young as three, were taken from their families without consent, trafficked across international boundaries and exploited as forced, unpaid child labor under a racial scheme to populate Australia with "pure white stock" from Britain and "working boys" from Malta. Now adults, Plaintiffs and members of the Class are former "child migrants" who have had their childhoods and families stolen from them as a result of this scheme. Nearly all were misinformed that they were orphans and that their parents had died or deserted and abandoned them. As part of this scheme, Defendants systematically destroyed any ties that the "child migrants" had to their families and past, even changing their names and in some cases birthdays to erase their personal histories. Others who arrived in Australia with their siblings were forcibly separated based on age and gender. Plaintiffs were not only stripped of their identities, but any semblance of rights.

2.      Defendants selected the children, arranged for their transport and exploited them as forced labor in an unlawful child trafficking scheme.  Despite receiving numerous subsidies from the governments of Australia, Britain and Malta for the education, clothing and welfare of child "migrants," Defendants provided them with little or no education, feeding them a starvation diet and even failed to provide them with proper clothing.  Instead, Defendants exploited the child migrants as forced and unpaid child labor at their own institutions and hired them out to others, as manual laborers and construction workers, as domestic servants, and in commercial laundries, compelling children as young as seven years old to perform dangerous and backbreaking adult work under conditions amounting to slavery.

3.      The scope and nature of the Australian child "migration" scheme remained concealed until an investigation was undertaken by the Australian Senate in 2001 prompted by a wave of sexual and physical abuse scandals, some involving child migrants, at institutions controlled by Defendants.  That investigation culminated in a report issued in March 2001 entitled "Lost Innocents – Righting The Record"  ("Australian Senate Report").  The Australian Senate Report found that most child migrants had been transported to Australia without any evidence of lawful consent and concluded that Defendants had subjected the child migrants in their care to systematic abuse, coercion and "use as slave labor." On November 15, 2009, Australia's Prime Minister formally apologized for his government's role in the child migration scheme.

4.      Plaintiffs Emmanuel Ellul, Valerie Carmack and Hazel Goulding bring this action on behalf of themselves and all others similarly situated ("Plaintiffs") against Defendants The Congregation of Christian Brothers ("Christian Brothers"), The Order of the Sisters of Mercy ("Sisters of Mercy"), the Mercy International Association ("MIA") as well as other existing but

as yet unnamed Catholic Religious Order Defendants that are culpable for the wrongful acts alleged herein. Plaintiffs respectfully request this Court to use its powers of law and equity to award restitution, compensatory or punitive damages in addition to injunctive and declaratory relief for the following grave breaches of customary international law: child trafficking, slavery, involuntary servitude, forced child labor, and cruel, inhuman and degrading treatment or punishment. Plaintiffs also assert common law claims for conversion, unjust enrichment, constructive trust, accounting and breach of fiduciary and/or special duty.

## II.    JURISDICTION AND VENUE

5.    This Court has jurisdiction pursuant to the Alien Tort Statute, 28 U.S.C. § 1350, in that Plaintiffs are aliens or non-residents of the United States alleging grave violations of the specific, universal and obligatory norms of customary international law. Jurisdiction is also proper under 28 U.S.C. § 1331 for those Plaintiffs and members of the putative Class that are U.S. citizens or residents because the claims asserted herein pose a significant federal question and involve federal common law. This Court also has pendent and/or supplemental jurisdiction over Plaintiffs' common law claims pursuant to 28 U.S.C. § 1367.

6.    This Court has personal jurisdiction over the Defendants because Defendants reside in or do business within the State of New York, and have minimum contacts with the State of New York based on purposeful availment of the laws of New York and continuous business activities in the jurisdiction.

7.    Venue is proper pursuant to 28 U.S.C. § 1391(a) in that the Defendants do business within this Judicial District and/or own property within this Judicial District pursuant to 28 U.S.C. § 1391(b).

### III.     THE PARTIES

**Emmanuel Ellul**

8.     Emmanuel Ellul ("Emmanuel") was born on February 12, 1946 in Valletta, Malta. As a result of financial difficulties, his family placed him for a brief period in an institution known as St. Joseph's Jesus of Nazareth.   He continued to maintain contact with his family including his mother and sister who visited him frequently.  While at this institution, however, Emmanuel was selected to be a "child migrant" by representatives of the Christian Brothers. Emmanuel was taken along with brothers, Peter (born 10/10/44) and Raphael (born 6/28/1950) and Michael (born 11/24/48).

9.     Radio broadcasts by the Christian Brothers misrepresented to Maltese families that the children would be free to return to Malta upon the completion of their schooling or that their parents could join them subsequently in Australia.  Newspaper accounts from the period in Malta repeat these misrepresentations from the Christian Brothers.  The Christian Brothers entered into an agreement with the Maltese government to facilitate their recruitment of "child migrants."

10.     Emmanuel and his brothers were put on the M.V. Flaminia which departed Malta on July 12, 1960 and arrived at Fremantle on August 6, 1960.   His family members came to see him off at the docks in Malta, believing that they would return after completing an education in Australia.

11.     Once in Australia, Emmanuel and his brothers were taken to Castledare Boys' Home and transferred thereafter to St. Mary's Agricultural School, also known as Tardun, where the Christian Brothers operated a large commercial farm of about 70,000 acres.  He was never taught English and forbidden to speak his native Maltese.  Emmanuel was beaten if he was

caught speaking in Maltese, even to his brothers, often with a leather strap.  Emmanuel and his brothers were also repeatedly told that there was no point in attempting to contact their parents because they were dead.  As was typical in the case of child migrants, Emmanuel was not permitted to receive any communications from his family.

12.     Corporal punishment and threats of physical violence were regularly imposed on Emmanuel and other members of the Class.  Systematic physical abuse was used by the Christian Brothers to instill an atmosphere of fear and intimidation to control the children in their care and to exploit their labor. The Christian Brothers also threatened Emmanuel and other members of the Class with the threat of religious damnation which would follow for any failure to comply with their directions.

13.     Emmanuel became a full-time "working boy" almost immediately and his brother, Raphael, started work as a forced child laborer at Tardun at the age of ten.  This term "working boy" referred to those boys who were treated as permanent farm and construction laborers without being given the benefit of education . The "working boys" lived in a separate portion of the institution, on the eastern side of the dormitory.  Other children at Tardun were prohibited from having any contact with them.  Emmanuel suffered from the lack of education and the long hours of work obligations prohibited his involvement in any opportunities for classwork. As the "working boys" from Malta had not been taught English, the Christian Brothers deemed them as being only fit for manual labor.

14.     Emmanuel's work was that of a farm laborer and included duties at the piggery and dairy.  He worked with his brother Raphael sometimes to prepare the fire for the boilers that were used for oats.  He was also required to chop wood and try to make sure that the boilers continued to operate for the oats.

15.     From 6:30 a.m. till nightfall, Emmanuel labored as part of a work gang under a Brother Howard where some of his duties, in addition to those described above, included:

- Lifting and stacking heavy bales of hay,
- Levelling wheat with a shovel in a bin on the back of a truck,
- Lifting and stacking bales of oats in the sheds.
- Burning off natural bushland,
- Helping to clear farmland of paddocks of stumps and roots,
- Seeding, which involved emptying heavy bags of super phosphate into a compartment on a tractor and distributing it with the seed.
- Stacking and loading sacks from the wheat hopper and load them onto a truck using a jib.

16.     Working with the loading and unloading of bales and bags of grain was heavy and hazardous work as these loads sometimes weighed well over 100 pounds.

17.     On March 26, 1963, Emmanuel was told that he had to leave the institution. Throughout the entire period that Emmanuel was there, he never received any pocket money or wages. After he left the institution, the Christian Brothers simply transferred him a farm at Eradu and told him that he had to work there for another year, which he did. Even here, Emmanuel did not receive wages for this year of work. Upon information and belief, Emmannuel was "hired out" to this farm by the Christian Brothers.

18.     His brothers, also child migrants, left Tardun separately from him. Emmanuel had lost all contact with them for nearly twenty years. One of his brothers has a permanent stutter as a result of the physical abuse he suffered at Tardun. Another of his brothers never recovered from the trauma and was placed in a psychiatric institution where he lives today.

**Valerie Carmack**

19.     Plaintiff Valerie M. Carmack ("Valerie") is a citizen of the United States and a permanent resident of Colorado Springs, Colorado. She is a former child migrant to Australia

who was recruited as part of the child migration scheme implemented by the Christian Brothers in association with the Poor Sisters of Nazareth in the United Kingdom.  Her maiden name was Valerie Lennon and her original date of birth was January 7, 1943.

20.    Born in Britain, she was selected as a child migrant and shipped to Australia on January 28, 1953.   Upon information and belief, her mother never consented to her transportation to Australia and was told only that she had been 'adopted' by another family in Britain.

21.    Upon her arrival in Australia, she was sent to Nazareth House where she stayed until January 9, 1959.  During her time at this institution, Valerie worked as a full time unpaid "working girl" taking care of the many elderly men and women residing at Nazareth House which functioned as an old persons' home.  She was forced to work at the institution from about 8.00 am to 7.00 pm, generally seven days a week.

22.    Her initial work duty was in the kitchen and scullery.  These included filling and carrying heavy baskets with coke fuel to start the fire for the ovens, stoking the fire and cleaning the heavy posts and large pans and scrub and polish the sinks and floors of  the kitchen on her hands and knees.  She also had to clean the refrigerators.  These procedures would continue until about 7.00 pm for seven days a week, although occasionally she was given time off on Sunday afternoons.

23.    Valerie was also forced to work in the 'old persons' home' taking care of as many as eighty (80) elderly men and women on behalf of the institution.  Her duties included dusting, cleaning, cleaning the sheets if they were soiled, cleaning the toilets and bathrooms and polishing the floors.  Valerie was forbidden to go to the nearby town or to the beach and was not given any

holidays.  She was constantly told that she was mentally retarded.  She was also misinformed that her parents had died.

24.     When she turned sixteen, Valerie was told that she had to leave Nazareth House and go and work as a "domestic" at the Dominican Convent at Dongara.  She worked a ten to twelve hour day at the Convent.  She only received 'pocket money' of about one pound a week. As was the consistent practice with "child migrants," most of her wages were allegedly being kept by the nuns for her "savings."  Aside from the one pound a week at Dongara, Valerie has never received any compensation for the forced labor she endured as a child at these institutions. She never received the alleged "savings" upon reaching the age of majority.

25.     As an adult, Valerie returned to Nazareth House to obtain her birth certificate when she was getting married.  She was informed there, for the first time, that she might have a mother but told that it would be pointless to contact her.  Valerie also made attempts to locate information about what happened to her through official records or archives.

26.     In 1993, she again traveled to Australia and contacted State Government officials seeking any records about herself. She was given an index card entitled "Migrant Child" attached to another document entitled "Movements and Remarks".  She was informed that there were no other documents.

**Hazel Goulding**

27.     Hazel Goulding ("Hazel") is a former child migrant to Australia who was recruited as part of the child migration scheme implemented by the Christian Brothers in association with the Poor Sisters of Nazareth in the United Kingdom.  She was placed in Nazareth House by her parents in the United Kingdom sometime in 1945 as a result of the bombing of London during World War II.  It was meant to be a temporary state of affairs.

Instead, Hazel was transported to Australia as a "child migrant" along with her sister, Veronica, and as many as thirty other children on the "S.S. Asturias". She does not believe she was ever issued a passport.

28.    Upon her arrival in Fremantle on or around September 22, 1947, all of her clothes and personal possessions were confiscated. She was placed in a different dormitory than her sister known as St. Joseph's. Her custodians were the Sisters of Mercy who were referred to by the child migrants as the "Sisters Without Mercy" for their cruelty towards their wards.

29.    Hazel started working at the age of eight at the commercial laundry and olive oil business operated by the Sisters of Mercy from their institution. She was beaten on a regular basis and routinely starved as punishment for disobedience. Hazel recalls being starved throughout the years she spent with the Sisters of Mercy. One of the nuns there took pity on her and would give her some food scraps from the kitchen that she could eat while hiding under the washboards.

30.    From the age of eight, Hazel was required to help operate the large boilers of a commercial laundry at the institution. Her sister would help chop the wood while Hazel would help stack it in the boiler room next to the boiler or carry it to wherever it was required. Her other duties included picking olives from the commercial olive grove maintained by the institution and carrying heavy buckets of olives for processing into olive oil.

31.    Hazel was also forced to work in the commercial laundry putting huge bedsheets into the mangle and rollers. She recalls the heat in the commercial laundry being so intense that she passed out in the drying room.

32.    From the age of nine or ten, Hazel was also compelled to work a 'construction' job carrying loads of bricks and stacking them for the toilets that the institution was constructing.

Her work at the institution was full time, seven days a week, from morning till night.  She never received any compensation for her forced labor, apart from a penny for each bucket of olives that were picked for processing into commercial quantities of olive oil.

33.    As with other members of the Class, Hazel received inadequate education due to the long hours of work forced upon her.  From the age of eight, she received only sporadic instruction.. She never received any education after the age of twelve.

34.    Her sister, Veronica, was sent away from the institution by the time Hazel turned eleven.  From the age of eleven to fourteen, Hazel worked full time at the St. Vincent's Foundling Home in the nursery for babies three to eighteen months and in another section for toddlers to age three and another section for children up to the age of seven.  She worked full time day duty until the age of thirteen when she was transferred to full-time night duty.  She slept on the floor on a thin mat in the infirmary.

35.    On one of her night duty shifts, Hazel was viciously beaten with a leather strap and had her hair pulled out by a Sister for refusing to put a dirty 'nappy' on an infant.  She ran away from the institution and ended up with the Salvation Army in a place known as Kings Park.  As in the case of other "child migrants" who tried to escape their condition, she was eventually caught and returned to the custody of the Sisters of Mercy.

36.    Child migrants that escaped the institutions were routinely returned to the institutions by local authorities because they lacked any legal papers concerning their identity such as those seized by Defendants or any proof of how they came to be in the country.

37.    After this incident until the age of fifteen, Hazel was kept in permanent solitary confinement in a small room at the institution.  The only visitor she had was a woman, who

would attend for about an hour twice a week who read to her.  She also ate in the room and used a separate toilet to the other girls.  On Sundays, she was let out only to go to Mass.

38.     The punitive consequences of Hazel's escape were typical of the tragedies facing child migrants that attempted to flee the institutions.  Punitive labor, starvation, whippings and canings were the punishments for attempted escapes from the institutions.  The Australian Senate Report recounts instances of boys who attempted to escape being forced to strip nude in front of their peers to have their heads shaved and being beaten severely.

39.     Unusually, in Hazel's case, her family somehow managed to track down her whereabouts and contacted the Sisters of Mercy institution.  She was eventually returned with her sister to to England in 1954.  Her records suggest that she was deported.

40.     Hazel returned to Australia in 1970.  She has contacted numerous Catholic organizations for her personal records and has been informed that no records exist.  She has also testified about her personal experience as a "child migrants' for the first public inquiry into child migration that was conducted by the Australian Senate in 2001.

**The Congregation of Christian Brothers**

41.     Defendant Congregation of Christian Brothers ("Christian Brothers") is a world-wide religious order established by the Apostolic Brief of 1820.  Defendant Christian Brothers (whose official Latin name is 'Congregatio Fratrum Christianorum') were one of the principal religious orders involved in organizing, maintaining and implementing the Australian Child Migration Scheme.  Also known as the "Irish Christian Brothers," the Christian Brothers is a worldwide lay organization with a centralized and internal management governed through elected officials.  Br. Philip Pinto is the current superior general of the Christian Brothers and head of its Congregational Leadership Team that is based in Rome, Italy.

42.     Since its founding in Ireland, and during the time period relevant herein, its institutions across the world have historically been financially supported through subsidies by local, state and federal governments, with such subsidies typically based on the number of children committed to its institutions. The Christian Brothers have established and maintained educational institutions in New York City since the turn of the 20th Century .

43.     The Christian Brothers have founded, operated and/or been affiliated, financially and otherwise, with several schools in the State of New York:

- All Hallows High School, New York City
- Bishop Kearney High School, Irondequoit
- Blessed Sacrament-St. Gabriel High School, New Rochelle (Brothers withdrew; school remains open)
- Cardinal Hayes High School, New York City
- Iona College, New Rochelle
- Iona Grammar School, New Rochelle
- Iona Preparatory School, New Rochelle
- Monsignor Farrell High School, New York City
- Notre Dame-Bishop Gibbons School, Schenectady (Brothers withdrew; school remains open)
- Power Memorial Academy, New York City (closed in 1984)
- Rice High School, New York City
- Sacred Heart of Jesus School, New York City
- Saint Cecilia School East Harlem, New York City (closed in 1991)
- Saint Lucy School East Harlem, New York City (closed in 2000)
- Commander Shea School East Harlem, New York City (Closed in 1974)

44.     The Christian Brothers through Brother Louis Conlon and others were directly involved in the selection, recruitment and trafficking of child "migrants" from Malta and Britain together with Monsignor George M. Crennan of the Federal Catholic Immigration Committee ("FCIC") a/k/a the Australian Catholic Migration Committee.   The former child "migrants" which are members of the Class were entrusted to the care of institutions in Western Australia run by the Christian Brothers including, without limitation, Tardun, Clontarf, Castledare and Bindoon.

45.     The Christian Brothers were involved in each step of Australia's Catholic child migration scheme.  They directly recruited the child "migrants" and transferred the boys to institutions under their control and ownership.  The Christian Brothers worked with the Sisters of Mercy and the Poor Sisters of Nazareth to actively recruit girls from the United Kingdom which were then conveyed to institutions controlled by the Sisters of Mercy.

46.     The scheme as a whole was overseen and approved by the Australian Conference of Catholic Bishops.  The Holy See called a Superior Migration Counsel to address Catholic migration issues to which Monsignor George Crennan belonged which became the Pontifical Council for Migrants on which Monsignor Crennan was also a representative.  As National Director of the Federal Catholic Immigration Committee ("FCIC") from 1949 to 1995, Crennan was one of the  principal architects of the Australian child "migration" scheme together with the Australian Conference of Catholic Bishops and participated in the recruitment, selection and transport of children from Britain and Malta to Australia.  The Catholic Episcopal Migrant Welfare Association ("CEMWA"), under Father Cyril Stinson, was also entrusted with responsibility for all Catholic child "migrants" transported to Australia.  The Christian Brothers were closely involved with the CEMWA and the FCIC in all its activities.  The FCIC was established in 1948 to represent the Australian Conference of Catholic Bishops on all matters concerning Catholic immigration.

**The Order of the Sisters of Mercy/Mercy International Association**

47.     Defendant Order of the Sisters of Mercy ("Sisters of Mercy") is a religious order of Catholic nuns founded by Catherine McAuley in Dublin, Ireland in 1831. As of 2003, the order has about 10,000 members worldwide, organized into a number of congregations.  The Sisters of Mercy have more than 118 members in the State of New York.

48.     The Sisters of Mercy have also founded or run schools in the State of New York including, without limitation, Our Lady of Mercy Academy, in Syosset, New York.  The Order was a custodian of many female child "migrants' in Australia at several institutions including, for example, St. Joseph's in Western Australia.

49.     The Sisters of Mercy were involved with the Christian Brothers in both the recruitment of girls through affiliated religious orders in the United Kingdom and as the custodian of child "migrant" girls at their own institutions in Australia.  The Sisters of Mercy worked under the direct authority of local bishops together with the Australian Conference of Catholic Bishops that acted together with the Christian Brothers in implementing the child migration scheme.

50.     Defendant Mercy International Association ("MIA") is a registered charity based in Dublin, Ireland that is the international organization composed of all of the Congregations and Institutes of the Sisters of Mercy throughout the world.  Defendant MIA maintains an office in New York, known as Mercy Global Concern, that represents the Sisters of Mercy as a worldwide religious order at the United Nations.  Its offices are at 777 United Nations Plaza, 6th floor, New York, NY 10017.

**Catholic Religious Orders Does 1-10**

51.     Plaintiffs are currently unaware of the true names and identities of Defendants sued herein as Catholic Religious Order DOES 1-10, and therefore sue these Defendants by using fictitious names. Plaintiffs will amend this Complaint to allege their true names and capacities when ascertained.

52.     Each fictitiously named Defendant is responsible in some manner for its involvement in the Australian child migration scheme and the injuries to Plaintiffs herein alleged

were proximately caused by the conduct of the named Defendants, as well as the Catholic

Religious Order Does 1-10.

## IV.     STATEMENT OF FACTS

53.     The practice of "child migration" dates back to the days of the British empire.

Early in the 19th Century, about 440 children were sent from the United Kingdom ("UK") to

South Africa as a substitute for the slave labor, which had recently been abolished.  After the

1850 amendments to the poor laws of the UK, the practice became institutionalized. Some 276

children were shipped to Rhodesia (now known as Zimbabwe) between 1946 and 1956, and

another 500 were sent to New Zealand between 1949 and 1954.  From the mid-1920s, when

Canada officially withdrew from the child migration scheme due to allegations of abuse,

Australia became the major receiving country.  Defendants' involvement in the scheme began in

earnest after World War II.

54.     In 1922, the British government promulgated a legislative basis for financing

child migration schemes. The Empire Settlement Act of 1922 (UK) permitted the government to

channel funds to the private organizations involved, and to cooperate financially with colonial

governments on schemes mutually agreed upon.  The legislation was to prove significant in

entrenching the system of state-subsidized child "migration" that was important to the

sustainability of the Australian child migration scheme.

55.     Estimates of the number of child "migrants" sent to Australia vary but one official

inquiry estimates that, from 1947 to 1967, nearly 10,000 children were transported to Australia

from the United Kingdom alone.  Approximately 310 child "migrants" were also taken from

Malta, then a British colony.  The scale and nature of the Australian child migration scheme had

no parallel or precedent in earlier practice.

56.    The child migration scheme was also a consequence of the legalized racism of the so-called "White Australia Policy," officially adopted by Australian governments from 1901 onwards.   Under this policy, Australia sought to import "pure white stock" or "good British stock" in order to preserve its purported character as an entirely white or Caucasian nation. No persons of color were allowed to immigrate or even enter Australia under its racial immigration laws until the 1970s.

57.    The Archbishop of Perth welcomed one of the first groups of British children arriving in 1938 with a speech that illustrates some of the racial and economic factors behind the child migration policy:

> `At a time when empty cradles are contributing woefully to our empty spaces, it is necessary to look for external sources of supply. And if we do not supply them from our own stock we are leaving ourselves all the more exposed to the menace of the teeming millions of our neighbouring Asiatic races...'

The need for cheap labor was always in the foreground of the child migration scheme, given that sources of cheap labor could not be obtained from nearby non-white countries under the White Australia policy.  Instead, the Australian government promoted the idea of the "child" as the "best migrant" based on the fact that they would provide a source of cheap labor that would not compete with the adult workforce.

58.    Almost all of the "child migrants" were taken from poor families, usually without any legal consent from a parent or guardian.  Where consent was obtained, it was based on intentional fraud and deceit, as in the case of Maltese child migrants.  For example, the Catholic Child Welfare Council (CCWC), a private Catholic organization in Britain that was involved in the scheme, provided an analysis of its own records and data which established that, of the 1,149 Catholic children migrated to Australia for which records were available, proof of consent by a parent(s) or other relative was only available in 229 instances (20%).

59.    After the Second World War, private Catholic organizations such as the Christian Brothers became the largest single sponsors bringing child migrants to Australia.  As the West Australian Department of Family and Children's Services has noted, such private organizations "in practice dealt with all decision making processes and procedures in relation to the selection of children, consents and migration arrangements."

60.    Australia's Commonwealth Government did not enact legislation addressing the issue of child migration until 1946 when the Immigration (Guardianship of Children) Act 1946 ("IGOC Act") was promulgated.  Clause 6 of the Act stated that:

> The Minister shall be the guardian of the person, and of the estate in Australia, of –
>
> 1.  every evacuee child; and
> 2.  every immigrant child who arrives in Australia after the commencement of this Act, to the exclusion of the father and mother and every other guardian of the child, and shall have, as guardian, the same rights, powers, duties, obligations and liabilities as a natural guardian of the child would have, until the child reaches the age of twenty-one years or leaves Australia permanently, or until the provisions of this Act cease to apply to and in relation to the child, whichever first happens.

61.    Subsection 5(1) of the Act enabled the Minister to delegate his functions and powers as guardian:

> ...to any officer or authority of the Commonwealth or of any State or Territory of the Commonwealth all or any of his powers and functions under this Act (except this power of delegation) so that the delegated powers and functions may be exercised by the delegate with respect to the matters or class of matters, or the child or class of children, specified in the instrument of delegation.

62.    The Minister delegated his powers as guardian of child migrants to State welfare authorities shortly after the legislation was enacted.  After the Commonwealth Minister for Immigration delegated his powers to the Western Australian Under Secretary for Lands and Immigration in 1947, indentures were drawn up between the custodians (the receiving agencies) and the delegated guardian, dealing with the respective responsibilities for the care of migrant

children. Under the terms of the indenture, each custodian agreed to '(1) bear all responsibility for the care and welfare of the children (2) not remove them from the place specified without consent, and (3) in all things comply with the provisions on its part relating to such children and contained in the *Immigration (Guardianship of Children) Act 1946*, and in the *Child Welfare Act 1947* and the regulations made thereunder and amendments thereto."

63.    Defendants the Christian Brothers, the Sisters of Mercy and others, assumed a duty of care as the lawful guardians and custodians of child "migrants" until they reached the age of majority. Defendants were 'in loco parentis' to the "child migrants."

64.    The process of arrival for child "migrants" included fingerprinting and the confiscation of travel documents or other proof of identity, making it virtually impossible for them to have a record of their original identity or family. Any money or personal possessions including toys, watches, rings, bracelets, necklaces, pendants, unopened letters and other addressed papers were confiscated. Many child migrants recall that their names were changed and a new birthday assigned to them. Some have recounted how they were often unaware, in many cases until adulthood, of their correct date of birth, and even of their correct name. Clothing given to them was tagged with the child migrant's number instead of their name. Letters from family, relatives or friends in their country of origin were confiscated or destroyed. The process of depersonalization was intended to break all links with the past and to destroy all record of their identities.

65.    Child "migrants" were consistently and uniformly told by Defendants' agents and representatives that their parents had died, or been killed in the war or that they had been abandoned or deserted by their family.

66.    Siblings were routinely separated as a result of the rigid separation of the sexes into different institutions required by Defendants.  Brothers and sisters were sent to different facilities based on their gender.  Siblings were also separated on the basis of age.  The separation resulted in many former child migrants losing contact with their siblings well into adulthood.

67.    Defendants the Christian Brothers, the Sisters of Mercy and other Catholic religious orders were involved both in the recruitment and as the custodians of the "child migrants" entrusted to their care.  In fact, the vast majority of child "migrants" were not orphans and many still have surviving family members, including either parents or siblings, in their countries of origin.

68.    Sexual and physical abuse of child "migrants," boys and girls, at institutions operated by Defendants was severe and pervasive.  Institutions operated and controlled by Defendant Christian Brothers in Western Australia - Bindoon, Castledare, Clontarf, and Tardun – have now become infamous.  Reports of systematic sexual and physical abuse at these institutions began surfacing in the mid-1990s from former residents.

69.    Inquiries into the reports and cases of child sexual abuse eventually uncovered the sordid history of the "child migration" scheme as a whole.  The first public investigation into the scheme in Australia was only commenced in 2001, resulting in a report entitled "Lost Innocents – Righting The Record"  ("Australian Senate Report").  The Australian Senate Report described for the first time the full scale of the child migration scheme, acknowledging that the vast majority of child migrants were not orphans, that many were taken without parental consent and were subjected to forced child labor on a massive scale in commercial contexts doing extremely arduous or backbreaking work of an adult nature.

70.     The Australian Senate Report describes the sexual abuse at the Christian Brothers' institutions as "horrendous" and of "quite exceptional depravity" presenting evidence of "systemic criminal sexual assault and predatory behaviour by a large number of the Brothers over a considerable period of time."   It notes that: "Evidence was given of boys being abused in many ways for the sexual gratification of the Brothers, of boys being terrified in bed at night as Brothers stalked the dormitories to come and take children to their rooms, of boys as 'pets' of the Brothers being repeatedly sodomised, and of boys being pressured into bestial acts."

71.     Physical abuse was, if anything, even more widespread.  The Australian Senate Report documents "criminal physical assault" of child migrants as "far more excessive and brutal" than could be justified as a disciplinary measure, even by the standards of the time: "It appears that some institutions or religious orders allowed, even encouraged, sadistic and excessive punishment. Systemic beatings designed to break down the will and subjugate the child migrants again draw parallels to stratagems used in concentration camps."  Even girls were not spared and the Australian Senate Report specifically referred to the institutions operated by Defendant Sisters of Mercy as among the worst for the depravity and cruelty of their systematic physical abuse.   The Australian Senate Report found in its investigation that punishments inflicted on child migrants "at times descended into what can only be described as torture."

72.     Defendants compelled child migrants to live under appalling conditions of subsistence survival.  The Australian Senate Report reflects submissions of children always feeling hungry, of rummaging through food scraps for the pigs, and of stealing fruit and vegetables from the gardens and orchards at the institution.  Some public sources recount tales of child migrants being made to scramble on the floor for scraps of food from the table of their custodians.  Child migrants were also deprived of clothing, often being given one set of clothes

for nearly the entirety of their childhood.  At some institutions, this meant a rough shirt and khakhi shorts with no underwear and no shoes.

73.    Defendants subjected the child migrants in their care to a brutal regime of forced labor including dangerous, backbreaking or adult work, of a commercial nature undertaken either at the institution or in commercial operations run outside the institution. Work was also used as a form of punishment.  Most of the forced labor - clearing vast tracts of farmland, construction work,  managing livestock  – was performed in addition to 'daily chores' at the institution.  In many instances, particularly in the case of Maltese "working boys," former child migrants were removed from school before the legal school-leaving age in order to work full-time as forced and unpaid laborers.  The high levels of illiteracy and semi-literacy among former child migrants are proof that Defendants failed to provide adequate education.

74.    At Bindoon and other institutions, child migrants were forced to clear land and perform heavy construction work, with little or no concern for safety, where young boys were used to build the facilities required at the institution. The working conditions were hard and dangerous and children often lacked protective clothing, such as boots, resulting in foot and hand injuries as well as cement and lime burns.  Children had to climb scaffolding, carrying up heavy loads of bricks, in the hot sun of Australia. There were many accidents, children falling off the scaffolding, bricks and rocks falling on children from above, children collapsing from heat exhaustion.

75.    Defendants sought, and received, capital funding from the Australian Government for all new buildings and equipment and for the extension of existing buildings to house child migrants. In 1946, the Commonwealth and State governments in Australia agreed each would

pay one-third of capital expenditure for Commonwealth approved projects to accommodate migrant children.

76.     In Western Australia, Christian Brother Paul Keaney sought funding for extensive construction work at Bindoon.  The extensive buildings and sprawling facilities of this Christian Brothers' institution were constructed almost entirely by the forced unpaid labor of children.  As the Australian Senate inquiry concluded: "The Catholic Church, in particular, gained financially from an increase in the value of its property holdings."  One submission to the Australian Senate inquiry described the situation as follows:

> Clontarf and Bindoon started off as bare ground. I understand that Bindoon was a 17,000-acre property given to the Christian Brothers and boys worked as slaves to create and turn that into a capital asset which must be worth millions in terms of the upgrading of the land, its farmability, the buildings that were put there. There were no wages paid to any of these children. They created the capital asset for the Catholic church and the Catholic church maintains the benefits of having that capital asset.

77.     The Australian Senate report itself found that Defendants did not make their institutions available to take child migrants without first gaining concessions from governments and that public funding towards capital works and children's maintenance provided a pragmatic reason for participation in the [child migration] program.  "Child labour was used for laundries, child nurseries, commercial contracts, construction, clearing and farming - all with government subsidies. These subsidies, coupled with the income from these activities, provided the means for the religious orders to exist and to be self-sufficient."

78.     The work on the swimming pool at Clontarf was similarly carried out by children who moved earth by hand and shoveled soil into bags which were carried up rickety and dangerous planks.  At Tardun as well, boys cleared land, planted wheat and provided labor for construction of facilities.  At least five boys died at in accidents at Tardun and Bindoon and

79.    Hard labor was not confined to the migrant boys.  Child migrant girls were used for construction work including carrying cement and bricks to build facilities used by Defendants.  Young migrant girls were also exploited as unpaid and forced child labor in large commercial laundries run by Defendants' religious orders including by the Sisters of Mercy. Female child migrants at the Sisters of Mercy 'orphanage' in Adelaide were forced to do 'strings and tags' for the Metro Meat Company.  Others recall operating huge industrial presses and washing machines used in commercial laundries before the age of 12.

80.    Defendants never paid any semblance of wages to the "child migrants" for the forced labor they were compelled to perform throughout their childhood.  Moreover, Defendants converted the numerous subsidies that were paid by state and federal governments in Australia as well as the British and Maltese governments for the education, welfare and maintenance of the "child migrants" in their custody and/or control.

81.    The Child Welfare Legislation incorporated by reference into the Indentures required Defendants to pay wages to the child migrants who were made to work apart from providing adequate room and board.  For children who were or could be construed as being employed, the Defendants were to pay wages, a proportion of which was to be contributed to a trust account maintained by the Child Welfare authorities.  In practice, Defendants paid no wages at all for work done at the institutions or outside, converting the wages that were meant to be paid including those that were to be placed in trust accounts on behalf of the child migrants. Similarly, pocket money was either not paid at all, as was generally the case, or claimed to have been paid into a trust account and converted.  Further, the Defendants, upon a uniform basis, did

not inform the children of the existence of such accounts upon their reaching the age of majority or at the time of their departure from the institution.

82.     Defendants converted numerous subsidies and payments made for the education, welfare and maintenance of the child "migrants" in their custody by the federal and state governments of Australia, Britain and Malta.   Payments were made for all children to the age of 16 years. State Governments in Australia agreed to pay 3/6 per week (three shillings and six pence). The Commonwealth's maintenance payment was replaced by child endowment of 5/- shillings per week which had been introduced in 1941 (increased to 7/6 and then 10/-) for all children resident in Australia aged under 16 years.  Australian State Governments were also supposed to provide child migrants with a clothing and pocket money allowance, and a wage subsidy upon leaving care, commensurate with the assistance given Australian wards. The Commonwealth [federal] government also agreed to pay an equipment allowance if the child was under 14 years at the date of sailing to Australia.

83.     Subsidies and maintenance payments by Australian State Governments varied greatly but remained in place over the decade from 1953 to 1963.  Western Australia at that date was contributing £1.3.3 per child per week while Victoria was contributing  6/- shilling per week and New South Wales 4 shillings, 8 pence per week.

84.     The Australian Senate Report presents the following details regarding the various subsidies and payments made for the welfare of child migrants.   In 1948, payments to child migrants up to 16 years were summarized as:

Commonwealth child endowment 10/- per week

State subsidy  3/6 per week

British Government subsidy 6/3 per week

Lotteries Commission  3/- per week

Total £1.2.9 per week

In 1963, payments were:

Commonwealth child endowment  10/- per week

State subsidy  15/- per week

British Government subsidy 1.5.0 per week

Lotteries Commission 10/- per week

Total £3.0.0 per week

85.     The Queensland Government provided the following information from Annual

Reports for 1954-55 and 1956-57 for payments for child migrants under 16 years of age:

Commonwealth child endowment  10/- per week

State subsidy 12/6 per week

British Government subsidy 12/6 per week

Total £1.15.0 per week

86.     Where a child was ostensibly attending secondary school at 16 years of age, the

State increased the payment to 25/- shillings per week and payments from the other Governments

ceased.

87.     The Queensland Government noted that in 1954-55 the amount paid by the State

Government to denominational homes for each State ward was 25/- shillings per week. In

addition to this amount, child endowment of 10/- shillings per week was received for each child,

making a total of £1.15.0 per week, the same amount received by the institution for each child

migrant. In all instances, the cost of medical and dental treatment of the children and of school

requisites was defrayed by the State, which also paid half the cost of buildings, extensions, repairs and other capital items.

88.     In 1950, the Maltese Government agreed to pay a 10/- shillings maintenance subsidy per week for each Maltese child "migrant" until the age of 16 years.

89.     In 1949, the Western Australia Child Welfare Department stated 'that no boy over the age of 14 years is attending school [at Bindoon], and yet subsidy has been paid for all lads under the age of 16 years on the presumption that they were attending school'. In further correspondence, the Acting Secretary of the Department remarked:

> Although I realise that if these recommendations are carried out the Institution will be deprived of a considerable amount of labour, I am afraid that if something is not done to rectify the present position both this Department and the Bindoon authorities will leave themselves open to a charge of exploiting child labour.

90.     Subsidies should have been discontinued once employment commenced and schooling ceased, but Defendants promulgated a scheme whereby children could be exploited as a pool of forced labor on the pretext of being 'trainees' or apprentices which enabled them to continue to convert these subsidies intended for the child migrants' welfare, breaching their fiduciary and special duty as custodians of the minors in their care.  Rather than using these subsidies and payments for their intended purpose which was to provide for the education, welfare, clothing and maintenance of former child migrants, Defendants simply converted them and used them in whole or in part for their own benefit.

## V.     EQUITABLE TOLLING & ESTOPPEL

91.     Catholic child migration to Australia continued unabated until the late 1960s or early 1970s.  Defendants exploited the philanthropic pretext of child migration to conceal what was, effectively, a child trafficking scheme in which children were taken away from their parents without lawful consent and sent to a distant country to be exploited as forced and unpaid child

labor under slavery-like conditions.   The scheme, by its very nature, was self-concealing because it involved the trafficking of minors from one country to another, either without the parents' consent or knowledge or through consent obtained by fraud or deceit.  The conversion of wages and subsidies was concealed from Plaintiffs.

92.    Defendants further engaged in affirmative misconduct to conceal their wrongful conduct by systematically and uniformly misrepresenting to Plaintiffs that they were orphans whose parents had died, been killed in the war or had otherwise deserted or abandoned them. Those systematic misrepresentations were based on a policy of promulgating a knowing falsehood intended to separate former child migrants from their families and to facilitate the concealment of their wrongful exploitation.  Defendants also implemented a policy of seizing and confiscating passports and other identifying information, personal items, letters or addresses from minor Plaintiffs to conceal their wrongful scheme.

93.    Defendants prevented Plaintiffs from learning their true identities by changing their names and birthdays in some instances in furtherance of concealing its unlawful scheme. Many former child migrants had no birth certificates, no other proof of identity nor any explanation of how they arrived in Australia well into late adulthood.  There have been numerous instances of former child migrants volunteering for service in Australia's armed forces or claiming social security benefits only to be informed for the first time that they are not Australian citizens but aliens subject to deportation unless they can document how they arrived in Australia.

94.    As documented in the Australian Senate Report, Defendants persisted in their affirmative misconduct of fraudulent concealment through time by destroying or withholding personal records and information about Plaintiffs in their possession, custody and control. Former child migrants who returned as adults to the institutions in whose care they had been

placed seeking records and information about themselves and their parents were denied access to their personal records and files or informed that the records did not exist and had been destroyed.

95.      These extraordinary circumstances surrounding the wrongs alleged here are sufficient to warrant equitable estoppel and should bar Defendants from invoking any statute of limitations or other defense of repose to these claims based on their deliberate, inequitable and wrongful conduct.  Defendants engaged in, and continue to engage in, a historic denial of their responsibility for and involvement in the Australian child migration scheme.

96.      Alternatively, any statute of limitations applicable to Plaintiffs' claims should be equitably tolled until at least March 2001.  Plaintiffs were minors at the time they were transported by Defendants to Australia.   Plaintiffs were prevented from commencing suit, despite their reasonable diligence, by Defendants' fraudulent concealment as well as the fact that documentary evidence concerning Plaintiffs personally and the child migration scheme as a whole was secreted away in Australia's National Archives under 30-year and even 100-year embargos.  Access to some documents such as indentures regarding guardianship from October 3, 1947 to August 8, 1960 is indefinitely restricted.  Access to some indentures with the Catholic Episcopal Migration and Welfare Association from June 15, 1953 to September 19, 1960 are subject to a 100 year restriction on access.

97.      An essential component of Defendants' scheme was to deprive Plaintiffs and the Class of education rendering them illiterate or semi-literate, which had the intent and the effect of preventing Plaintiffs from timely commencing suit or exercising their legal rights.  The Australian Senate Report received evidence that illiteracy among the Maltese child migrants who were institutionalized at Christian Brother institutions was particularly prevalent : "the child migrants [who] worked at institutions, such as Bindoon, with no remuneration– as a consequence

of this work – which took the place of education – many Maltese child migrants never learned to read and write and so remained illiterate."  In regard to other child migrants, the Australian Senate Report concluded: "For many of the migrant children the illiteracy resulting from inadequate or lack of education has remained a severe handicap throughout life."

98.     Plaintiffs could not have known that Defendants were required to pay wages or put a portion of wages into trust accounts on their behalf under Australian law.  Nor could Plaintiffs have known that Defendants were retaining and converting numerous subsidies paid for their benefit to educate, clothe and feed child migrants.  These facts, together with Defendants' acts of fraudulent concealment prevented the disclosure of their wrongful scheme until the Australian Senate investigation, the first public inquiry conducted in Australia with evidence and submissions from former child migrants and Defendants' representatives, that resulted in a report entitled   "Lost Innocents – Righting The Record" in August 2001.

99.     On March 22, 2001, the Catholic Church's Joint Liaison Group on Child Migration issued a formal statement to the Australian Senate regarding the child migration policy that acknowledged overall moral responsibility but in all other respects continued its historic policy of denial and evasion.  On November 15, 2009, Australia's Prime Minister Kevin Rudd issued a historic apology for his country's role in the child migration scheme.

100.     Plaintiffs' equitable claims for conversion and taking of property in violation of international law are not barred by the statute of limitations based on Defendants' continuing wrong in wrongfully converting, withholding and retaining the proceeds of trust accounts with monies from wages and governmental subsidies that were intended for the benefit of Plaintiffs and other former child migrants.

## VI.     CLASS ACTION ALLEGATIONS

101.    Plaintiffs bring this action on behalf of themselves, and all others similarly situated who were transported from Britain or Malta to Australia by Defendants from 1947 onwards and subjected to forced child labor under the Australian child migration scheme. Plaintiffs seek to certify a class pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

102.    There are predominating common questions of law and fact relating to the claims of Plaintiffs and the Class including, but not limited to, the following:

    (a)    whether Defendants used deceit or other improper means (including an absence of any lawful consent) to transport members of the Class to Australia for purposes of exploitation in a manner that constitutes child trafficking under international law;

    (b)    whether Defendants exploited members of the Class as forced child labor in violation of international law;

    (c)    whether Defendants' illegal conversion of wages and subsidies through trust accounts on behalf of members of the Class constitutes a conversion;

    (d)    whether Defendants breached their fiduciary and/or special duty to members of the Class in converting the trust accounts that were to be maintained on their behalf until the age of majority;

    (e)    whether Defendants may be held liable for providing an accounting to members of the Class for the wages and/or subsidies contained in trust accounts that were to be maintained on their behalf;

    (f)    whether Defendants may be held liable for restitution and disgorgement of profits to members of the Class;

(g)    whether Defendants may be held liable may be liable for compensatory damages and the measure of such damages;

(h)    whether Defendants' conduct was wanton, intentional and outrageous; and

(i)    whether Defendants may be held liable for negligence and recklessness in their implementation of the Australian child migration scheme.

103.    The members of the Classes sought to be represented by Plaintiffs are so numerous that joinder of all members is impracticable.  Although the precise number of individuals in the putative Class is not known with certainty, reliable official estimates suggest that members of the Class would range from 5,000 to 10,000 individuals.  Members of the Class are also geographically dispersed.  Upon information and belief, former child migrants are now settled in the United States, Britain, Malta and Australia.

104.    Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication. The claims are so numerous and significant that it is likely that there would be a limited fund available from Defendants' assets inadequate to compensate Plaintiffs and the Class for either compensatory or punitive damages, or both. Individual litigation of these claims would be entirely impractical and would impair the ability of Class members to protect their interests.

105.    The claims of the named Plaintiffs are typical of those of the Class, and the named Plaintiffs will fairly and adequately protect the interests of the Classes.   Plaintiffs' interests do not conflict with those of the Class, and Plaintiffs are represented by counsel experienced in complex litigation, including class actions and international litigation. Plaintiffs seek redress for the same conduct that has affected all class members and Defendants' liability on the legal claims advanced herein would be common to all members of the Class.

106.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   In the absence of a class action, courts will be unnecessarily burdened with multiple, duplicative individual actions. Moreover, if a class is not certified, many meritorious claims will go unredressed as the individual class members are not able to prosecute complex litigation against Defendants. Finally, it would be logistically and financially impossible for the thousands of class members to each bring an individual action.

## VII.    DEFENDANTS' VIOLATIONS OF LAW

107.    The causes of action asserted herein arise under and violate the following laws, agreements, conventions, resolutions and treaties without limitation:

(i)     Customary International Law;

(ii)    Slavery Convention signed at Geneva on 25 September 1926 (League of Nations);

(iii)   Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar to Slavery (entered into force April 30, 1957);

(iv)    Protocol Amending the Slavery Convention signed at Geneva on 25 September 1926, done Dec. 7,1953,7 U.S.T. 479;

(v)     International Labour Organisation Convention No. 29 Concerning Forced or Compulsory Labor (1930), 39 U.N.T.S. 55 (entered into force May 1, 1932);

(vi)    International Labour Organisation Convention No. 105 Concerning the Abolition of Forced Labour Convention;

(vii)    International Labour Organisation (lLO) Convention 138 on

Minimum Age for Employment (1973) 1015 U.N.T.S. 297

(entered into force June 19, 1976);

(viii)    ILO Convention 182 on the Worst Forms of Child Labour (1999)

38 LL.M. 1207 (entered into force November 19,2000);

(ix)    United Nations Charter, 59 Stat. 1031,3 Bevans 1153 (1945);

(x)    Universal Decl. of Human Rights, G.A. Res. 217A(iii), U.N.

Doc. A/81O (1948);

(xi)    International Covenant on Civil and Political Rights, G.A. Res.

2220A(xxi), 21 U.N.Doc., GAOR Supp. (No. 16) at 52, U.N.

Doc. A/6316 (1966);

(xii)    Protocol to Prevent, Suppress and Punish Trafficking in Persons,

Especially Women and Children, supplementing the United

Nations Convention against Transnational Organized Crime (UN

General Assembly, 2000); and

(xiii)    Federal common law.

## VIII.   CLAIMS FOR RELIEF

### COUNT I

### CHILD TRAFFICKING
### IN VIOLATION OF CUSTOMARY INTERNATIONAL LAW

108.    Plaintiffs repeat and reallege each and every allegation set forth in all of the

preceding paragraphs as if fully set forth herein.

109.    Defendants participated in and organized, implemented or financed a scheme for

the unlawful transportation of minors using fraud, deceit and otherwise without lawful consent

for the specific purpose of exploitation of the minors.  At all relevant times, Defendants knew that the former child migrants, once transported to Australia, were to be exploited as a source of unpaid and forced child labor.  Defendants also hired out the former child migrants to third-parties to be exploited as unpaid and/or forced child labor.

110.    Defendants repeatedly made material misrepresentations or otherwise used fraud, deceit or improper means to obtain the consent to transport child migrants.  Defendants promised that Plaintiffs and Class members would be given better educational opportunities and vocational training.  Defendants promised that the parents of child migrants would be able to eventually join them in Australia as migrants or that former child migrants would be permitted to return to their families in their countries of origin once they had completed their education.  Defendants selected children from impoverished families with limited financial resources and education for the specific purpose of furthering this scheme.  Defendants were responsible for arranging their transport to Australia and acted as their custodians and legal guardians upon arrival.

111.    Defendants repeatedly and consistently made false representations to Plaintiffs and Class members that they were orphans, that their parents had died or otherwise abandoned and deserted them.  Upon information and belief, the majority of former child migrants and Class members were trafficked by Defendants without any lawful consent from parents or relatives.

112.    Plaintiffs have been significantly harmed and injured as a direct result of these violations of international law by Defendants including, without limitation, being unlawfully separated from their parents and/or extended families, being deprived of the wages owed to them for their labor, being deprived of educational benefits, clothing and maintenance that were to be given them based on subsidies as well as experiencing pain and suffering as a result of forced labor as children, resulting in extreme and severe mental anguish and emotional distress.

113.    Defendants' conduct was intentional, fraudulent, willful and/or oppressive, and was undertaken with a deliberate and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

## COUNT II

### FORCED AND UNPAID CHILD LABOR
### IN VIOLATION OF CUSTOMARY INTERNATIONAL LAW

114.    Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

115.    Defendants' systematic use of and implementation of a regime of forced child labor under the conditions described herein violates the law of nations, customary international law and worldwide industry standards and practices including those current in Australia at the relevant time.  As children, Plaintiffs and members of the Class could not consent to this work, which was predominantly of a commercial character and often involved dangerous or back-breaking work suitable only for adults.  Even if they could have consented, Plaintiffs and Class members were in all relevant instances coerced to labor by concrete threats of physical abuse, starvation and punishment including expulsion into an alien country as 'orphans' without any parents, relatives or guardians.  As a direct result of Defendants' conduct, Plaintiffs were placed in fear for their lives, were deprived of their freedom, and forced to suffer severe physical and/or mental abuse.

116.    Plaintiffs have been significantly harmed and injured as a direct result of these violations of international law by Defendants including, without limitation, being deprived of the wages owed to them for their labor, being deprived of educational benefits, clothing and

maintenance that were to be given them based on subsidies as well as experiencing pain and suffering as a result of forced labor as children, resulting in extreme and severe mental anguish and emotional distress.

117.    Defendants' conduct was intentional, fraudulent, willful and/or oppressive, and was undertaken with a deliberate and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

COUNT III

SLAVERY OR INVOLUNTARY SERVITUDE
IN VIOLATION OF CUSTOMARY INTERNATIONAL LAW

118.    Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

119.    Defendants transported Plaintiffs and members of the Class as children from Britain and Malta to Australia using false promises or deceit and otherwise without consent. Plaintiffs and Class members were literally physical captives in the control and custody of Defendants who exploited them as forced child laborers over a period of many years, profiting from their forced labor, hiring them out as unpaid laborers as well as reaping economic benefits from a system of subsidies paid by various governments for the welfare of their captives.

120.    Defendants used physical threats, violence, force and coercion in addition to physical deprivation and starvation to coerce Plaintiffs and members of the Class to perform as unpaid and forced child laborers.  Defendants profited and/or benefited from this regime of slavery, slavery-like practices and/or involuntary servitude from the thousands of child "migrants" they were able to obtain from Britain and Malta.

121.    Such conduct amounts to slavery and/or slavery-like practices constituting a grave breach and violation of universal, obligatory norms of international law.

122.    Defendants' conduct was intentional, fraudulent, willful and/or oppressive, and was undertaken with a deliberate and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

COUNT IV

UNJUST ENRICHMENT

123.    Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

124.    Through the acts described herein, Defendants unjustly enriched themselves at the expense of Plaintiffs and members of the Class.  Defendants benefited by an increase in the property value of buildings and institutions that were created by forced child labor, such as at Bindoon and Tardun.  Defendants also unjustly enriched themselves by using the subsidies paid by various governments for their own purposes instead of spending them on the welfare, education and maintenance of Plaintiffs.  Finally, Defendants unjustly enriched themselves and benefited from the forced and unpaid child labor of Plaintiffs and Class members, including without limitation through conversion of their wages and from hiring them out to third-parties as unpaid or forced child laborers.

125.    Equity and good conscience compel the conclusion that Defendants should not be permitted to retain their ill-gotten gains and benefits.

126.    Accordingly, Plaintiffs and members of the Class are entitled to the equitable relief of restitution and disgorgement of profits by which Defendants were unjustly enriched in an amount to be determined at trial.

## COUNT V

## BREACH OF FIDUCIARY AND/OR SPECIAL DUTY

127.    Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

128.    The elements of a breach of a special duty are: (i) an assumption by the [defendant], through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (ii) knowledge on the part of the [defendants'] agents that inaction could lead to harm; (iii) some form of direct contact between the [defendants'] agents and the injured party; and (iv) that party's justifiable reliance on the [defendants'] affirmative undertaking.

129.    Defendants assumed an affirmative duty to act on behalf of Plaintiffs and Class members that were child migrants under their lawful custody and/or guardianship.  That duty included the obligation to maintain trust accounts for Plaintiffs and Class members until they reached the age of majority in which wages were to be maintained on their behalf.  Defendants' failure to ensure that those trust accounts were properly maintained on behalf of Plaintiffs and the Class constitutes a breach of special and/or fiduciary duty.  Defendants knew that the failure to pay the proceeds of those trust accounts to the former child migrants when they reached the age of majority would result in harm to Plaintiffs and members of the Class.  Finally, Plaintiffs and Class members justifiably relied on Defendants' undertaking to maintain and pay out the proceeds from those trust accounts after they reached the age of majority.

130.     Defendants also received numerous subsidies for the education, maintenance and welfare of Plaintiffs and the Class.  Instead of using those subsidies for their intended purpose, which was to benefit Plaintiffs and the Class, Defendants misappropriated and converted them to their own purposes and for their own uses.  Defendants knew that the failure to spend those subsidies for the benefit of Plaintiffs and the Class would result in harm to them by depriving them of adequate food, clothing and education.

131.     Defendants never paid out any proceeds from those trust accounts.  Defendants never applied the subsidies for the benefit of Plaintiffs and the Class.  That non-feasance is the basis for the breach of special duty claim.

132.     Defendants also owed a fiduciary obligation to act in the best interests of the child migrants as minors in their care as their lawful custodians and/or guardians.  Defendants were in loco parentis to Plaintiffs and members of the Class.   Instead of fulfilling those fiduciary obligations, Defendants exploited Plaintiffs and Class members as forced and unpaid child laborers, deprived them of meaningful education and literacy, disregarded the basic requirements of their welfare such as food or clothing and, when they reached the age of majority, simply ejected them from their institutions without any support, preparation or after-care.

133.     Accordingly, Plaintiffs and members of the Class are entitled to the equitable relief including incidental, consequential and/or exemplary damages for Defendants' unlawful breaches of fiduciary and/or special duty.

<u>COUNT VI</u>

<u>CONVERSION</u>

134.     Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

135.    Plaintiffs and members of the Class were deprived of their property including without limitation wages and subsidies that were expressly for their benefit.  Defendants deprived the child migrants of property by failing to deposit wages into trust accounts that could be paid to their rightful owners once they reached the age of majority.  Defendants also misappropriated subsidies received by them from numerous governments that were to be used for the education, clothing and welfare of Plaintiffs and the Class to whom Defendants were legal guardians and fiduciaries.

136.    Defendants converted the wages and subsidies that they received as fiduciaries and guardians to Plaintiffs and the Class.  The wrongful exercise of control over property also includes instances where one is initially in lawful possession of property, but subsequently refuses to return the property to its lawful owner.

137.    Accordingly, Plaintiffs and members of the Class are entitled to the equitable relief of restitution of the property that Defendants converted including, without limitation, damages for such conversion and prejudgment interest in an amount to be determined at the trial of this action.

COUNT VII

CONSTRUCTIVE TRUST

138.    Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

139.    A constructive trust is an equitable remedy designed to prevent wrongful ownership of property and unjust enrichment.  As Judge Cardozo noted: "the constructive trust is the formula through which the conscience of equity finds expression."

140.    The elements of a constructive trust are: i) a confidential or fiduciary relationship, ii) a promise, express or implied, iii) a transfer made in reliance on that promise, and iv) unjust enrichment.

141.    Defendants had a fiduciary relationship with Plaintiffs and members of the Class who were minors under their lawful custodianship and/or legal guardianship.  Defendants made an express or implied promise under color of Australian law to return to Plaintiffs and members of the Class the proceeds from trust accounts maintained on their behalf when they reached the age of majority.  Wages were paid or supposed to have been paid into those trust accounts maintained by Defendants.  Defendants were also paid subsidies to be used for the benefit of Plaintiffs and the Class.  Those transfers were made in express reliance on Defendants' promises to maintain the proceeds in those trust accounts on the behalf of former child migrants until they reached the age of majority.

142.    Defendants violated their promises and legal obligations and were unjustly enriched thereby.

143.    Accordingly, Plaintiffs and the Class request that constructive trust be established to provide for the return and restitution of property taken from them.

<u>COUNT VIII</u>

<u>ACCOUNTING</u>

144.    Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

145.    A special and/or fiduciary relationship existed between Defendants and Plaintiffs as well as Class members.  Defendants were fiduciaries for trust accounts maintained on behalf of Plaintiffs and members of the Class.  Defendants were the custodians and/or legal guardians of

the Plaintiffs and Class members until they reached the age of majority. Defendants failed to pay the proceeds of the trust accounts to Plaintiffs and Class members when they reached the age of majority breaching their fiduciary and/or special duties.

146.    Plaintiffs are entitled to an accounting of the discrete proceeds of their missing wages and the subsidies intended for their benefit that were never spent on their welfare from Defendants either based on the trust accounts or based on Defendants' intentional failure to maintain those wages in trust accounts in accordance with applicable law.

147.    Accordingly, Plaintiffs and Class members request equitable relief in the form of an accounting from Defendants regarding the wages they were never paid and the subsidies that were never allocated to their education, maintenance or welfare.

<u>COUNT IX</u>

<u>CRUEL, INHUMAN AND DEGRADING TREATMENT
IN VIOLATION OF CUSTOMARY INTERNATIONAL LAW</u>

148.    Plaintiffs repeat and reallege each and every allegation set forth in all of the preceding paragraphs as if fully set forth herein.

149.    The acts described herein had the intent and the effect of grossly humiliating and debasing the Plaintiffs and Class, forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

150.    Defendants subjected Plaintiffs and the Class to a brutal regime of forced child labor, against their will and under threat of physical harm, requiring them to perform dangerous, unpaid or back-breaking work of an adult nature for Defendants' economic benefit. In furtherance of the forced labor scheme, Plaintiffs and members of the Class were placed in great fear for their lives and physical safety, and suffered severe physical and psychological abuse and agony.

151.    To the extent necessary, Defendants' conduct took place under color of law and/or in concert with those acting under color of official authority, such that harms and injuries inflicted on Plaintiffs and Class members as a result of the wrongs described herein were inflicted deliberately and intentionally through the acts and/or omission of responsible state officials and/or their agents.  The Government of Australia officially sanctioned the child migration scheme, making it a co-venturer, and through its knowledge of the conditions of forced child labor ratified the unlawful conduct and acts alleged herein.  Moreover, Defendants were aided and abetted by the Government of Australia which continued to pay numerous subsidies to Defendants despite their knowledge of systematic use of forced child labor by Defendants and despite their knowledge that these subsidies were not used for the education, welfare or maintenance of former child migrants.

152.    Defendants' conduct was intentional, fraudulent, willful and/or oppressive, and was undertaken with a deliberate and conscious disregard of Plaintiffs' rights.  Accordingly, Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at the trial of this action.

## IX.    DEMAND FOR JURY TRIAL

153.    Plaintiffs demand a jury trial on all issues so triable.

## X.    PRAYER FOR RELIEF

WHEREFORE, each Plaintiff and the putative Class respectfully requests relief and demands judgment against the Defendants as follows:

(a)    that this Court certify this case as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)      adjudge and decree that Defendants are legally liable for some or all of the claims asserted in this Complaint;

(c)      award such compensatory damages against Defendants as permitted by law in an amount as proven at trial;

(d)      award such incidental, consequential and special damages against Defendants as permitted by law in an amount as may be proven at trial;

(e)      award such punitive and exemplary damages against Defendants as may be permitted by law in an amount as proven at trial;

(f)      grant the equitable relief of accounting, restitution and disgorgement as sought by the putative Class in whole or in part;

(g)      award reasonable attorneys' fees and costs of this litigation, including the costs of experts; and

(h)      grant such other and further relief as the Court deems just and proper.


Dated: New York, New York
       December 30, 2009

Respectfully submitted,


/S/

_____
 By: H. Rajan Sharma (HS 3598)
Neal A. DeYoung (ND 3098)
SHARMA & DEYOUNG LLP
286 Madison Avenue, Suite 2002,
New York, New York 10017
(212) 561-1907

Attorneys for Plaintiffs and the Class